Case No. 13-1278, Missouri Public Service Commission Petitioner v. Federal Energy Regulatory Commission. Ms. Shemwell for the petitioner, Ms. Banta for the respondent, Mr. Corman for the intervener. Ms. Shemwell. Good morning. May it please the Court, I'm Lyra Shemwell. I represent the Missouri Commission, and by extension I represent natural gas consumers nationwide. FERC's general policy is that acquisition premiums may not be included in rates. They have developed a benefits exceptions test, which has two prongs. The first is whether the facilities containing the acquisition premium are being put to new use or the facility is becoming FERC jurisdictional for the first time. The second prong, which this Court has described as the key prong, is whether or not the pipeline is able to demonstrate tangible, non-speculative benefits, quantifiable in monetary terms. Can I pick up and ask one thing? Has anybody had to pay this rate that includes the acquisition premium? Yes, Your Honor. Can you explain to me how it works? Because I know there was the initial rates, and then there was right here in a settlement, and it was supposed to end in 2013, and I don't know what happened after that. So can you explain that to me? Yes, Your Honor. FERC sets initial rates under Section 7, and FERC did set the initial rates. They refused to consider this in 2002 and 2006. There was a rate case then in 2007, which included a settlement. It was a black box settlement. The initial rates were charged between the time they were approved and the time that the settlement took effect. So if you were to prevail, would somebody get a refund? Yes. There's a year-and-a-half period where there would be a refund to consumers, and then this would be a live issue in the next rate case. And the company is required to file a cost and revenue study this month, which may result in a rate case. Do you know what happened after 2013? Wasn't there a settlement that expired in January 2013? I'm not sure what happened in 2013. I'm sorry. I thought there was a settlement or agreement that went through January 2013, and then I might be misrecognizing it. There was a settlement in the rate case, but I believe that will be in effect until the next rate case. Okay. So those settled rates are still the ones that are in effect? That's correct. The settlement agreement, not the ones that include the acquisition agreement. Yes, in the settled rates, we specifically set aside this issue that it would be an open issue in the next rate case. Thank you. It's important to remember that the benefits must be substantial and quantifiable, and the comparison is the difference between the net book value and the purchase price, not the purchase price and a speculative estimate of a hypothetical construction. This comes out of the United case, which is the foundational case for inclusion of acquisition premiums and rates. The United case only addressed the second prong, which is the ultimate test, and the first prong actually came out of Longhorn. This case is back before this court today because FERC has reached a conclusion and refused to consider record evidence, and that was a reason for the courts vacating and remanding the case last time. Could I ask you about Longhorn? On the face of Longhorn, it would appear to uphold the commission's view today. Isn't that right? With respect to the second prong. The second prong, are you saying that it costs more to build new construction? Yes, that's what they said in Longhorn. The commission determined that the proposal met the second prong of the test since the conversion would result in utilization of a currently underutilized facility, which could not be replicated for the price Longhorn was willing to pay. And that may be a benefit, but it doesn't necessarily become a benefit. But it was enough in that case, right? And it may be enough in several cases. For example, in cities, it was enough because Kansas City needed more natural gas. So they were either going to build a new pipeline to bring more natural gas to the area, or they were going to convert a pipeline. But with respect to the commission's statement of what the test is, doesn't that suggest that they're following their precedent? Well, I would suggest that this court's remand order defined what the test is. Well, we'll pass on that for just one moment. But before that remand order, there was another opinion of this court in Rio Grande, right? Correct. And in that case, we again said, citing Longhorn, for the second prong, that the purchase price is less than the cost of constructing a comparable facility. So now we have this court blessing Longhorn's second prong in just the way the commission is using it today. Isn't that a problem for you? I don't think so. I believe Rio Grande is a very different case in many ways. For one thing, it's not under the Natural Gas Act. It's a common carrier under the Interstate Commerce Act. And in Rio Grande, the court carefully described a rate-making procedure under the ICA for a common carrier. And it's quite a different rate-making procedure. It's under 342A and B, I believe. Is there a rule about the depreciated cost benefits exception? Is that any different under those two circumstances? At least the court in Rio Grande appears to have thought it was the same test. Is it wrong? Is there a difference in the actual substantial benefits test? I think that the substantial benefits test that comes out of United says that the benefits must be substantial, quantifiable, non-speculative in monetary terms. But isn't there a view that it's substantial and quantifiable in monetary terms if there's a substantial difference between the price that would have to have been expended to create the facility new and the acquisition price? That can be the benefit. That alone, our suggestion is it isn't necessarily. In this case, it was not. So is your position then that as to the second prong, that's a shorthand, in effect, what we've been discussing so far, and that when you look at the cases themselves read in the factual context, your case is different? Arguably. I mean, the hypothetical would be no one you serve, you say you represent national gas consumers, but in terms of representing the commission, the Missouri Public Service Commission. Is your point that applying the second test simply based on purchase price would not make any sense in a jurisdiction where there is no need, there is no desire for, and there will be increased rates to the very consumers who are supposed to benefit? Is that the type of argument you're making? That's correct. In other words, you're agreeing that we have defined the test in the way you've said and that FERC, the commission, has defined the test that way. But it can't be that any time there's this price differential, there's necessarily the benefit that the second prong requires? I'm saying that an estimate that it costs more to construct would apply to the specific facts of a case, which is exactly what you say, Your Honor. It must be a fact-specific inquiry. So here the commission has conducted a fact-specific inquiry, and it's come to the conclusion that both prongs of its test have been met. And your brief argues, well, it didn't consider certain evidence that was before it, I guess because you think it didn't discuss it enough? Well, at 525 paragraph 113, order opinion 525 at paragraph 113, FERC flatly refused to consider evidence contrary to its desired result. It said since we have already found that on this basis the company has met the second prong, then we don't have to look at contrary evidence. And the evidence was that a customer received no benefits, and Missouri's expert, Ms. Fisher, let me say that this case is unique because we have operational history between the time that the acquisition premium was to be included and when it was actually considered by FERC. Ms. Fisher's testimony is clear that during the first three years of operation, MIG did not have any customers. No customers saw a benefit to using that pipeline except for an affiliate with a 60% discount. And this was based on a cost and revenue study that MIG filed at FERC. So it was their document that showed that they didn't have any customers using that pipeline. I understood FERC's answer to this to be that this question, which is whether or not the customer's benefit is the question of the issuance of the certificate, and that when the certificate was issued in, I guess, 2002, that was the question, FERC concluded that this would diversify the sources for Missouri customers for gas supply options and that that's where the benefit would come in. And that if somebody disagreed, that's what should have been challenged, but nobody challenged the certification. Have I at least got their response to you correct? That may be their response to us, yes. So why isn't that right? Judge Rogers points out that it is, and I understood your argument similarly, that, yes, it's nice if the price is cheaper than building a new pipeline, but if nobody in Missouri is going to use it, it doesn't help us any. But FERC's answer, I take it, is that, well, we would never have issued a certificate under those circumstances. We only issue it if there's a benefit to the customers and a need, and we concluded that in 2002, and that's a separate proceeding. What's the answer to that? Section 7, the requirements under Section 7, are wholly different than the requirements under the accounting principle of whether or not an acquisition premium should be included in rights. FERC did not approve the acquisition premium in 2002 because the pipeline didn't even admit the existence of an acquisition premium until we went to hearing in this case in 2011. So FERC could not have considered whether or not there were benefits to the acquisition premium. And FERC made very generalized statements. If there are benefits, I mean, just take this hypothetical. Imagine that Missouri customers needed this additional supply of gas. They needed it, okay, and there were two ways of providing it, but there's no dispute that they needed it. Once you know that they needed it, isn't it a substantial benefit to get it at a cheaper price? Well, you put two things in your hypothetical that would be true. If they needed it, which they've shown that they did not. But why can't they conclude in the certification proceeding that they needed it? They did not consider that there was an acquisition premium. Why does that matter? The question, the first question, I said assume. Yes, Your Honor. Let's first consider whether they need the additional facility. And then, assuming that they do need the additional facility because they need more gas or they need diversified supply or whatever, isn't it always true that the customers will benefit if the facility can be obtained more cheaply, either by acquisition or by construction? The test is, do the benefits meet? I mean, yes, if the facility's going into rates and it's cheaper and they need that additional source, but FERC absolutely ignored Amron's testimony that it didn't need it, that it had satisfactory and cheaper service for other pipelines. Is part of the issue here, correct me if I'm wrong, are there different audiences that we look at for the benefit in the two inquiries and the public convenience and necessity? It could be national interest, it could be other businesses, it could be security, state, cross-border, these types of things. And my understanding of the acquisition premium test is whether the rate payers will be benefited. You've stated it absolutely correctly. So is there any finding in issuing a certificate of public convenience and necessity that these rate payers would be benefited? They might benefit, but the public policy is very broad. Is there a finding in this case when they issued the public certificate of public convenience that these rate payers would be benefited? I don't believe specifically in quantifiable benefits. Is there a nonspecific and nonquantifiable finding that these rate payers would be benefited? Not that I know of. Doesn't the 2002 certification say that the project will provide Missouri customers the opportunity to diversify their gas supply options? Not just any customers, not people in Maryland or Texas, but in Missouri. Yes? Yes. I don't think, would they have been able to have issued a certification if there weren't benefits for Missouri customers? Yes. They would have been able to? I believe they would have been able to, because they're looking at the public convenience and necessity. And they're talking about moving gas from west to east and how Rockies gas east, which might bypass Missouri completely in terms of customers, and that everyone east of the Rockies would benefit from greater access to Rockies gas. And that's a very general nonspecific and nonquantifiable benefit. But in this case, they said, again, I'm just reading a little more as I go along here, again from the 2002 decision, such impacts will be outweighed by the benefits of Missouri's new pipeline that will enhance competitive alternatives to the region. Currently, doesn't that count? I mean, why do you have to have any more than that to know that building it cheaper will be better? Getting it, obtaining it cheaper will benefit those customers. They'll be charged less. You have to look at those specific customers under the accounting procedure in line with the United case from 1961. They have to be specific, nonspeculative, tangible, and quantifiable monetary terms. And I don't believe enhancing competition has been considered to be quantifiable. And I think in its Enbridge Pay PC case, FERC specifically said we can't quantify competition as a benefit. Okay. Are there further questions from the bench? Thank you. Good morning. I'm Carol Banta for the commission. I'll pick up with this last point. Judge Garland, your question is exactly on point. In the 2002 certificate order, the commission determined that certification of this pipeline, where there was none before, this is taking, I mean, it was a dormant pipeline. There was no interstate gas pipeline providing this service before. And the commission said it is required by the public convenience and necessity. And it's, I believe, in paragraphs 2, 5, 17, and 18 of the 2002 certification order, it addressed those benefits. And if you look at, and I'll just connect that to this case, in paragraph 93, in the rehearing order 525A, the commission said that the argument that, or that Missouri's argument here appears to challenge the commission's issuance of a certificate of public convenience and necessity to place the T&P facilities in interstate service in 2002. It's not the first. Hypothetically, what would FERC's response have been if there's an unchallenged certificate of convenience and necessity that this pipeline should be put into use, but the pipeline in running across the geographic area also runs across a state that is overwhelmed with natural gas. It doesn't need a drop more. But it's clear from FERC's perspective that the region needs more. Must the people within that jurisdiction that does not need any more also pay for something that they're claiming is absolutely no benefit to them and is increasing their rates? Well, there would be, obviously, a factual inquiry into who would be paying the rates. Would it be shippers? No, but just on my hypothetical. On your hypothetical, I don't know the answer to that. Because I haven't seen that case. So Mrs. Fisher's testimony in the report doesn't make that case? She was talking about 2006, the merger, the certification of the merger and the idea that gas might be passed through west to east. In 2002, this pipeline was certificated to provide interstate service incoming only. And the reasons cited in that 2002 order, and I think we all agree. Incoming into Missouri? Into Missouri. And I remember that the relevant paragraphs are 2, 5, 17, and 18. I forget exactly which one. It's quite a memory. I know. I've been over it a few times. Somewhere in those four paragraphs, the commission made the point that at that time, the then intrastate or at least Henshaw state regulated pipelines, the only source of gas coming into them was from a panhandler connection at the northwestern part of the state. Certificating this trans-Mississippi line was going to make it possible to interconnect to the MRT line in Illinois and bring additional supplies into the state of Missouri that were needed because of the limitation on that pipeline, at least of interconnection with panhandle. That was the specific finding in 2002. Going to the question of whether these kinds of benefits of security of supplies, Why do I want to back up here? In 2002, you found a public convenience in having this one-way merger of authorities. That seems to me a very different determination than the finding you're supposed to make under the acquisition premium test, and that is that the acquisition for which the premium is being charged, which was not 2002. It was. No, it was. It is. This all has to go back to what's the initial rate base of that pipeline. It's limited to the 2002? I thought it included all of the other transactions that came in as well and the other mergers that came in later. No, no. Missouri itself argued in its rehearing request and in its reply brief, responding to us where we had cited a few things from the benefits in the 2006 order. That was our brief. That was not the commission's order. The commission's order consistently cited paragraph 18 of the 2002 order. Let me explain the reason for this. The reason is that at the time that this pipeline is created, in essence, where there was no pipeline providing any kind of natural gas service under, or at least this pipeline under the Mississippi River did not exist for all practical purposes before 2002. The commission found that it was in the public convenience and necessity to have an interstate pipeline connecting to MRT to bring additional supplies into Missouri. Under that Section 7 finding, you can build a pipeline on a Section 7 finding like that. And the commission, I mean, many, many Section 7 cases have that result. You can build it. So the logic behind the commission's approach to the acquisition premium and a conversion case where there's no concern about double paying for depreciation by taking an existing gas pipeline and changing the cost of it, where it didn't exist, where you had a dormant oil pipeline that you converted, which the commission also said in the orders we consider to be a positive thing, as in Longhorn, using an underutilized facility, or in this case a dormant facility. If you can convert it and use it for less than it would have cost to build a new pipeline that could have been certificated on that same finding, that's the logic of the commission's approach in conversion cases. Why isn't there required to at least be a finding that there would have been enough demand that there would have been a new pipeline built? For that comparison to have any distinction. The whole action here, the whole gravity of it is that this is cheaper than building a brand new one. If the answer to a denial would have been, okay, I guess we won't do it, we'll do something else, then you haven't given anybody any benefit. Well, if the pipeline decided that it wasn't worth building it, it wouldn't happen. But if the commission certificated it as being required by the public convenience and necessity, So does that mean that in these conversion cases, there in fact is no longer an acquisition premium inquiry? As soon as the certificate issues, automatically an acquisition premium will be allowed? No, because you do have to show what it would have cost to construct the new one. Well, it seems to me, isn't it going to be almost all the time? Not necessarily. How often will it be? Well, I think we haven't seen the case because there wouldn't be a business case for proposing such a project, but the commission said in... What if it's really close in price? Well, it would have to be under because the commission said commensurate. Now, here it was at least one and a half million, if not more, which is more than the disparity in the natural gas case from the 80s. I'm sorry. No, it's my fault. I thought part of the finding here, too, was that the rates would just be no more than what it would take if they built a new pipeline. And that doesn't seem to me like you to explain how that fits with the requirement, not just of a benefit, but substantial benefit. That's the test that you all have articulated in the conversion case, a substantial benefit. How is it a substantial benefit when it's only $1.4 million, which I think is about the lowest I've seen in your cases? There's no... If I may interject, there's a $1 million disparity in the natural gas case. I mean, that was the name of the pipeline, natural gas pipeline. But I think in that case they didn't pass on the risk of low demand to the rate payers as they've done here. Now, that didn't... I'm sorry to interrupt. No, no, please do. And the commission addressed that distinction in, I want to say, the rehearing order, where it said that it was charging an incremental rate for that new pipeline in that case, but that was the case here, too, in 2002. Again, this doesn't get folded in. If what Missouri is arguing is that the merger shouldn't have happened or that the zoned rate design that resulted from the merger in 2006, if that's what we're arguing about, that is not about the 2002 certification. I think what they're arguing about, or I guess what I'm questioning about, not arguing, I'll question about is who got the substantial benefit here. Well, and what the commission said, if you look at 2002, we certificated this pipeline. It certainly has been bringing supply. I mean, I don't know as much about the operational history because the acquisition premium should have been decided in 2002, and in this proceeding was decided as of 2002. I'm sorry, so can we try one more time? Can you identify or did the commission identify which rate payers got a substantial benefit and what that substantial benefit was? Are you saying that everybody in the public was convenienced by it, and so that counts as rate payers getting a substantial benefit? Missouri benefited from getting a pipeline that brought new sources of gas, new security of supply in 2002. Are you saying Missouri rate payers? Yes. Correct me if I'm wrong. Please interject. Correct me if I'm wrong. The substantial benefit has to go to actual existing rate payers? Well, no, there were no existing rate payers. There were no existing rate payers. I mean, that's the point. As of 2002, there were no existing rate payers. Right, so who do we look to for the substantial? Who has to be getting the substantial benefit? The rate payers that used that pipeline after that certification in 2002 because if the commission certificated a new pipeline, the construction cost of that pipeline would be the initial rate base. They would be paying for that. So the logic here is that if you get that same pipeline at less than it costs to construct it, that is the benefit. And I think the reason it gets muddy is because the evidence that Ameren had put in this proceeding was all about what happened after 2006, and the reason that the commission didn't ignore their evidence in paragraph 54 of the rehearing order, they had put in evidence that would negate benefits that MOGAS had claimed and additional benefits resulting from 2006. Can I ask you, this could have been certificated based on a need in another state. Is that right, passing through? I think it could. And if that had happened, would this be a different case? Well, I think the question, I think it would be, I'm not saying it would come out the other way. You would have to look at who's paying rates on that pipeline. And, you see, in this case, when it was certificated, the rate payers were going to be whoever was paying to ship gas in from Illinois into Missouri from the MRT system that had not been previously available because all they had was panhandle. After 2006 with the merger and this concern. I'm just asking you whether we can hold this question for another day or we have to decide this question today. Imagine that it was certificated on the need for consumers in another state, but that the rate payers included Missouri rate payers who didn't need any more. Would that be a different case? Because they would not get any benefit, not just not a substantial benefit. It would require a different factual analysis that we don't have here because I'm trying to think of exactly how that would come about. If they didn't use it, they wouldn't be paying the rates. It's not like it's a pipeline that doesn't have any outlets in Missouri. It does, and they are paying for the gas that they obtain, but they don't need any more. They don't need any more sources, but the neighboring state does. And that's why the additional pipeline is used. Maybe it's something that would never get certificated. I don't know. I'm just trying to think how that would play out because if it's a conversion case, nobody was on that pipeline. There aren't existing customers. And certainly I should add that in a Certificate of Public Convenience and Necessity, the commission, as part of I think its certificate policy statement, does examine whether existing customers of a pipeline will be subsidizing new customers. Now that wasn't an issue in 2002 because there were no existing customers. There was no pipeline. In 2006, that was a concern that Missouri and Ameren. It was a pipeline. It was just an intrastate pipeline. No, but that was not involved in the 2002 proceeding. Again, I say this is where we're getting a little muddled because of the 2006 proceeding that merged the pipelines into a single system and put a zone rate design. And everything that Missouri and Ameren were talking about, about how we didn't want this, we don't want it folded into the rate for what used to be our Henshaw pipeline, those are all 2006 issues, not 2002. And the commission in the 2006 order addressed the question of whether existing customers would be subsidizing new customers. It specifically addressed that in 2006. It actually found against the pipeline and found for Missouri on rehearing in that case. None of that is here. That is a rate design issue. Don't we have some of the problem that Chief Judge Garland referenced in a little different package here, and that is that by the time of the 2013 decision that's under review here, you actually had people who were purely intrastate consumers paying the rate for this acquisition premium. How can that be a substantial benefit to them? Because that's not the question. In 2002, we certificated this pipeline. It could have been constructed. It was converted. The initial rate base of that facility is set as of 2002. It didn't happen for a variety of reasons, and that's why we did this proceeding, and that's why all the data and most of the arguments are about 2002. In 2006, the commission certificated a merger of three existing pipelines, two Henshaw, one interstate. It authorized the merger of those existing pipelines, and it looked at the rate design for the merged system, and the 2002 initial rate base of the one piece of it carries forward into that. So then all we're arguing about, or we're not arguing, this is not that case, the question then, which was fully addressed in 2006 and not appealed, is should we have this merger? Is this merger bringing these two intrastate pipelines into an interstate system that clearly some parties didn't want, and that's fine? The commission considered all that. That wasn't even appealed. Certain parties also didn't like that the TMP facilities, the former interstate, and one of the Henshaw pipelines were combined into zone one of the rate design. That's a rate design issue, which the commission fully considered and even found in part for them, also not appealed. When we're talking about what is the initial rate base of the TMP facility, regardless of what happens later with the merger that was decided separately and not appealed in that aspect, and the rate design issue, which also was not appealed in that aspect and which will come up again in future Section 4s, those are separate issues because the question is what initial rate base did the TMP facility bring in and what should it have brought in, and this is going back to look at the 2002 certification. The test, as I understand it, for the acquisition premium, is not just that there be substantial benefit, but that there be a find and a determination by the commission that that benefit comes directly from whatever acquisition was at issue and is commensurate with, and I'm having a little trouble. It's one thing to say, generally speaking, it's better to not have to pay for more expensive new if you can refurbish old, but in a case like this where the evidence of demand and need is so frail. But it's not. In 2002... I guess I'm still not understanding. Was it that you hypothesized that there will be demand? Is it hypothesized beneficiaries or is it supposed to be actual beneficiaries, which sounds like they haven't materialized in this case. That's why they're now having to pick up the risk instead of the pipeline of not having sufficient demand. Well, I don't think that's the case, and I'll have to leave that to Intervenor to discuss more of the operating history. As part of any Section 7 certification, the commission looks at the potential demand. I know that it's not focused on here because it wasn't relevant to this determination, but in the 2002 certification order, the commission did look at what Missouri Interstate was the company at the time, what it expected in terms of, I think it projected a 50% capacity. They actually put in evidence in that proceeding of how much gas they expected to be moving and what they thought their rate recovery would be on that. And I don't remember the specifics of that, but in every certification case, the commission considers that. It's not going to certify one just because you say, we think this would be a great idea. The commission does look at those things. I guess I've always understood the acquisition premium to be a separate inquiry that's undertaken after the certificate. No. Then why do we have all this case law? Why hasn't the commission for the last 20 years, and why haven't our cases for the last 20 years said, why are we talking about acquisition premiums? Of course there's a benefit because a certificate was issued. It just becomes a, there's no point to the inquiry whatsoever if you're just going to look at the certification, particularly because certifications are looking at a different concept of public convenience and necessity as opposed to substantial benefit to rate payers. That is commensurate to the acquisition premium. I don't even know why. Why did the commission say it's almost impossible to meet tests if it can be, at least in conversion cases, uniformly met? That's the key. Let me start with the idea that it's weird to do this in a Section 7. It's not. Cities was a Section 7. But I didn't read the commission decision. Crossroads was a Section 7. I'm sorry. I just didn't read the commission decisions there to say, we don't need to make any inquiry because we already issued a certificate. That subsumes the acquisition premium test. In fact, each of those cases would begin with, well, normally we don't, this is a very strict test, but why did they say that? Let me explain. First, like I said, most of the cases have been 7s, the cities, the crossroads, the K and interstate. These are routinely done together. In fact, that was what this court found to be the commission's failing. In the 2010 case of having – Maybe you can decide the two at the same time, but they're different tests and they're different inquiries. That's how it's always been articulated until the re-hearing decision here. No. 1978 in cities, and certainly by Longhorn, although cities and crossroads both preceded Longhorn. In conversion cases, the commission had – it is true that in general if you come in, this is the United case and many of the non-conversion cases, if you come in and try to say, well, this is going to benefit people in these various ways, it's extraordinarily hard to quantify. And that's why no one has succeeded in doing it. In a conversion case, the logic, as the commission has explained it, if we would have – if you could have built a new one, if we granted you a certificate that could have built a new one and you converted an underutilized facility off an old dormant oil facility, something like that, which there is a benefit to doing. We want to encourage the commission. That's the one case where it is quantifiable because you can say, I guess my problem is with the word could have as opposed to would have. If it was would have, then there would be a benefit. If the math all works out, which you all sort out, there would be a benefit because we're doing one or the other, and why don't we do the cheaper one? And I guess you'd have to sort out whether sometimes it's better. Well, it just comes out of Section 7 that when we find something to be – when the commission finds something to be required by the public convenience and necessity, you can build it. No, but what if they said they might – refurbishing this thing, merging these things might, might have made sense and the pipeline might be willing to do it at that price. But the reason they wouldn't build a new pipeline is because there wouldn't be enough demand to subsidize the expenses of a new pipeline. And so the demand relationship only supports the cost for the refurbishment or using the conversion of the old one, but it wouldn't support the other. What is the benefit then? Because they would say, no, if we have to build a new one, we're not doing it. So what's the benefit? And that can happen. I mean, you can give a Section 7 certificate and then decide not to build. I guess the commission hasn't in any of these cases made a different analysis of finding out whether it is in the public convenience and necessity to have it and then deciding as a matter of accounting and initial rate base whether you can Just a question of finding that the differential matters. Has any real-world material implications for the case? I'm sorry? What seems to be missing is not that, but that there's just no – the commission doesn't seem to think it needs to find that this expense would have ever been incurred. I mean, a benefit – it's not a benefit to me if they weren't ever going to spend the extra money to build the new pipeline. How is that a benefit? What did I say?  I saved nothing. Because it's a benefit to have the pipeline. And that wasn't even, I think, contested. Well, it's a benefit to have the existing, but the acquisition – I mean, you all adopted these accounting rules, right, that don't generally favor acquisition premiums. And so you're the ones that demand some type of showing. Well, that's because they're hard to quantify. But in a case where you can compare reuse, repurposing of a converted pipeline to the construction cost, the commission finds that quantifiable.  And the construction costs are your initial rate base. I mean, that's just basic. So if you get the pipeline for less, that quantifiable differential is a quantifiable benefit to having – Not unless somebody wanted it. I mean, like if you said you can have steak or salad for lunch, right? Well, no one – I don't think anyone opposed – I'll give you steak at the price of salad, and you might say that's a benefit. But I'm vegetarian, so I don't really want that steak. All right, let's see whether the intervener has a view about steak and salad. Since they're on the same position as FERC, maybe they can – maybe they're vegetarian, I don't know. May it please the Court, Paul Korman for the intervener in support of the commission's order. Just to get back to where we've been, there is significant evidence in the record of benefits. It's controverted. Missouri has pointed to the evidence of Ameren, but there is significant evidence put in by MOGAS of significant benefits. For example, the record reflects that the majority of the company's customers, following the merger, switched their delivery paths to actually use the newly certificated facilities. So the gas was coming in – For the ALJF commission credit, that evidence? The commission determined that it didn't need to consider that because the commission interprets its test – and remember, we're applying a commission test here. The commission interprets this test to be met when the acquisition cost is lower than the cost of construction. And they find that because they believe that results in lower rates. And they specifically stated that in this order, and they specifically stated it in the rehearing order, that the acquisition cost was lower than the cost of construction, and that results in lower rates to the consumers. And that is the second part. Right, so this evidence that you mentioned doesn't help us because it wasn't endorsed by the commission. It's not the rationale for their decision. No, the commission does say it results in lower rates. The commission does say in – I'm sorry, which paragraph are you on? I'm in 110, Your Honor, where they're talking about the construction cost estimate. But then if you go down to paragraph 113, which you mentioned earlier, that talks about the recourse rate being no higher and actually lower. It doesn't say actually lower.   Or possibly. Or possibly. It says it will be no higher. It's not somewhat lower. That doesn't seem like a finding of lower to me. But in the rehearing order, where the commission talks about the Ameren evidence, Your Honor, in paragraph 54, it says, even if we were to accept Ameren's claim that it received insufficient quantifiable benefits resulting from demand charge credits, flexible point rights, and lower initial rates, after MoGAS went into service, we still find that MoGAS meets the second prong of the test because the commission's view of the test... But it doesn't give me why they met it. It just says it has a period. We still find they met the test, period. It doesn't give any explanation other than I'm assuming they mean the difference between new and old and converted. Yes, I think their orders are clear. And their test, in a conversion case, in a new use case, the test is very clear that if it costs less to acquire than it would to construct, that provides economic benefits because it results in a lower rate base. Is there another case you can point me to, a conversion case, where they applied the conversion is cheaper than new test, where there was evidence in the decision of insufficient demand to support a new pipeline? Of insufficient demand? Yes, that there was evidence that there wouldn't have been, or there was not evidence or reason to believe there wouldn't have been a new pipeline. Well, I don't know if there is such a case because the demand test, the question of whether the pipeline should be built initially is determined in the original Section 7 certificate. But I would respectfully disagree with Your Honor that there is no evidence of demand here. What the commission is doing in the order is discussing the AMRIN evidence, and it's making the determination that it doesn't really need to address that, and then it says even if it addressed the AMRIN evidence, it took into consideration it needs to second prompt. The commission discussed the AMRIN evidence. The commission did not discuss, and there is some significant evidence in Mogass' brief below, and I think particularly in the company's brief on exceptions at about page 30, and I'm sorry I don't have the Joint Appendix site, there's a discussion of the significant benefits, the point I made earlier about... Well, my recollection is that ALJ didn't credit your witness on everything, so I'm not sure we could sort of go back and look at your briefs and say you put something in and support the commission's decision, unless they had embraced it, obviously, that would be their call. I think it's disputed. The commission felt like it did not have to either credit our evidence or the AMRIN evidence. But when we're hearing it addresses the AMRIN evidence, it says, well, even if all that, even if you discount all of the benefits to AMRIN, which the commission recites, including lower rates, we still find this meets our test, because this is a lower cost of acquisition than it would be of construction. And the commission has, with all due respect to Missouri, a broader national interest to protect. The certificate question is actually a national question, and the commission clearly has an interest in encouraging the reuse of underutilized or unused facilities in lieu of new construction, especially when it costs less to acquire than it would have to build. And here, that's really undisputed. Ms. Shemwell referred to the speculative evidence on cost of construction. It's not speculative at all. There's evidence in the record by an expert that was not cross-examined. That expert was found credible, I believe, by both the administrative law judge and specifically by the commission. And the differential, the $1.4 million, this is, in the scheme of these things, Your Honor, relatively inexpensive. So you're talking about a $10 million project with a $1.4 million differential, which is, you know, 14% or 15%. You have other cases where, on a percentage basis, the differential was even smaller. So I think here, the commission has correctly applied its own test. All right, I think now you've tripled the amount of time we gave you. Oh, I'm sorry, can I just ask one fact question? Of course. Where I started with them, do you agree that some rate payers have paid the rate that includes the acquisition premium? And if so, did they do so because they had no choice or because they had an option of prior rates or the new rate and they chose to pay? The acquisition premium was embedded in the rate in the new pipeline in 2002. It was embedded in the rate in the merged facilities. But the commission, as it points out in this order, in the underlying certificate order, which was not appealed, the commission adjusted the rate to ensure that there was going to be no subsidy from anybody who did not use the new facilities. So the commission addressed the subsidy issue in the underlying order, and it points to that in this one. Okay, but my understanding now is that, in fact, that's changed and that the rates have changed and that, in fact, now rate payers are having to pay based on a different ground, and they're having to essentially bear the risk of underutilization, and that includes people who are purely interest state users. That's not correct, Your Honor. The rate history is that the rates that are at issue here were, in effect, from mid-'08 through January 1, 2010, and those rates were the rates the commission set in the certificate order where they addressed the potential for subsidization and reduced low-gases building determinants so that there would be no subsidization. The rates that went into effect on January 1, 2010 are part of a black-box settlement to which the Missouri Commission was a party. So those rates are just a stated rate. It is... Nobody knows what went into that. Ms. Schemmel was correct. The company will file a cost and revenue study this month, and that could lead to a Section 5 rate case. It could not. We don't know. But prior to the settlement, there was a period that did include the acquisition premium and the rates. The 18-month period of initial rates were in effect. It was in there, but as I said, the commission... That's okay. I think you've answered the question. Thanks. We'll hear from Ms. Schemmel. Does she have any time? No. We're going to give you two minutes. Let's hold it for two minutes, okay? Let me say I believe your analysis was correct. I want to talk about estimate, if I may, quickly. The United case, the fact that it may be difficult or perhaps impossible to establish the dollar benefit that benefits have accrued to consumers in excess of the original cost, it's not the difference between the acquisition premium paid and some estimate, which is, in fact, speculative. The estimate is speculative. So the differences between what the original cost would have been, those have to be your benefits, including the acquisition premium. Burke did not recognize the existence of the acquisition premium in 2002, so they could not have found benefits that resulted from the acquisition premium in the 2002 case. And that certificate case did not force customers to pay, and they didn't pay. MIG took the risk. MIG assumed the risk. The 2006 case does force customers to pay. If I make a quick distinction between Rio Grande in this case, in Rio Grande and in Longhorn, the customers needed the service. There wasn't an alternative service. This MIG is an alternate service to what they already have. It didn't say that in the opinion of Rio Grande. I'm sorry? It didn't say that in the opinion and not in our opinion. In Rio Grande? Right. All we said was it was enough, that it was cheaper to build. That's all we said in our opinion. That's true. The court didn't actually decide Rio Grande on that basis, so they found that a per se exclusion of the acquisition premium was not acceptable. And this, in essence, has become a per se exclusion. It's sort of an inclusion. It's a flip side of Rio Grande, this case is, because they found one fact and said, okay, so you automatically get in. And the court's opinions did list benefits of lower costs. Lower rates. I'm sorry, lower rates. We did challenge the inclusion of the acquisition premium in rates in 2002 in front of FERC, which the court discussed in its remand order. And you found it arbitrary and capricious that they did not address the acquisition premium then or in 2006. All right. Thank you very much. Do we have any more questions from the bench? I have one. No? No, I don't know. I didn't get the question. May I have one more? I would like to ask that you vacate this entire decision with instructions that FERC consider all the evidence, explain its policy changes in lowering the burden of proof, and why there are special circumstances when, in fact, in Enbridge, they say there are no special circumstances. Thank you. Okay, thank you. We'll take the matter under submission.
judges: Garland, Rogers, Millett